457 S.E.2d 524

**Cassandra Dianne JACKSON, Plaintiff,**

v.

**Harvey L. DONAHUE and Builders Transport, Inc., a Virginia Corporation, Defendants.**

**No. 22282.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 1, 1994.

Decided April 14, 1995.

588

Barry M. Hill, Weirton, W. Eric Cloud, Washington, DC, for plaintiff.

James A. Varner, McNeer, Highland & McMunn, Clarksburg, for defendant, Harvey L. Donahue.

John E. Busch, Busch & Talbott, Elkins, Alan M. Gelb, Pamela A. Phillips, Christopher A. Marothy, Fischbein, Badillo, Wagner & Itzler, New York City, for defendant, Builders Transport, Inc.

McHUGH, Justice:

This case is before this Court upon two certified questions from the United States District Court for the Northern District of West Virginia. *W.Va.R.App.P.* 13. The plaintiff is Cassandra Dianne Jackson, and the defendants are Harvey L. Donahue and Builders Transport, Inc. (hereinafter "BTI"). The case involves the issue of whether the plaintiff may seek the self-insurance proceeds of BTI as part of her recovery in a personal injury action.

I

The plaintiff, who was an unauthorized passenger in a freight truck owned by BTI, brought an action in federal district court against the truck driver, Harvey L. Donahue, and his employer, BTI. BTI is a Virginia corporation authorized by the Interstate Commerce Commission (hereinafter "ICC") to operate a long-distance trucking service. BTI has been permitted, under federal law, to self-insure its bodily injury and property damage liability. 49 U.S.C. § 10927 (1988)[1]

---

1.  49 U.S.C. § 10927(a)(1) [1988] provides for the filing of "a bond, insurance policy, or other type of security" by a motor carrier concerning inter-state operations. As that statute provides, in part:

and 49 C.F.R. § 1043.5 (1994).[2] In addition, in 1991 BTI was permitted by the West Virginia Public Service Commission to self-insure bodily injury and property damage liability to a level of $500,000 combined single limit per occurrence.[3]

The facts giving rise to this action are largely undisputed. In 1991, while in route for BTI, Harvey L. Donahue met the plaintiff at a truck stop in Houston, Texas. The plaintiff asked him for a ride, and Donahue consented, notwithstanding the fact that BTI had a written policy prohibiting drivers from carrying passengers. The plaintiff did not have a particular destination in mind and decided to ride with Donahue for several weeks.

On November 22, 1991, Donahue was driving the truck on a mountain highway near Elkins, West Virginia, when he lost control of the truck and went down the side of the mountain. Both Donahue and the plaintiff were injured. The plaintiff, who was 24 years old at the time, was rendered a quadriplegic, although she has since regained some use of her arms.

Throughout the proceedings in the district court, BTI maintained that it was not liable to the plaintiff for any negligence with regard to Donahue's driving, because Donahue had violated BTI rules in allowing the plaintiff to ride in the truck. BTI moved for summary judgment on that ground. However, the motion was denied.

The security must be sufficient to pay, not more than the amount of the security, for each final judgment against the carrier for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles under the certificate or permit, or for loss or damage to property ... or both. A certificate or permit remains in effect only as long as the carrier satisfies the requirements of this paragraph.
This provision was amended in 1994 but not in a manner relevant to this case.

**2.** 49 C.F.R. § 1043.5(a) (1994) provides, in pertinent part:
*As a self-insurer.* The Commission will consider and will approve, subject to appropriate and reasonable conditions, the application of a motor carrier to qualify as a self-insurer, if the carrier furnishes a true and accurate statement of its financial condition and other evidence that establishes to the satisfaction of the Commission the ability of the motor carrier to

Thereafter, a settlement was reached which provided as follows:

A settlement has been reached between the plaintiff and CIGNA Insurance [Co.] for payment of $2 million on behalf of the defendant. This $2 million is a settlement for the amount of the plaintiff's claim against the defendants which exceeds $500,000. Defendant BTI is self-insured for the first [$500,000] of the plaintiff's claim, and the plaintiff's entitlement to this first $500,000 is an issue yet to be resolved. In essence the settlement represents a compromise of the amount of the plaintiff's damages at $2.5 million, with the $2 million in excess of BTI's self-insurance being paid now, and with the plaintiff's entitlement to the first [$500,000] to be determined as an issue of law in the future. The $2 million settlement will release CIGNA and defendant Donahue completely from liability to the plaintiff, and it will release defendant BTI from liability in excess of its [$500,-000] of self-insurance.

Subsequently, the district court certified the following questions to this Court:

1. Under West Virginia law, does a foreign commercial trucking company which has been granted authority to self-insure its automobile liability exposure in West Virginia owe coverage to an employee irrespective of vicarious liability?[4]

If the answer to question 1 is yes, then:

satisfy its obligation for bodily injury liability, property damage liability, or cargo liability.

**3.** In essence, the PSC granted BTI, as a self-insured entity, permission to carry bodily injury liability insurance in the amount of $14,500,000 (with its excess liability carrier) and $500,000 in primary self-insurance for total coverage in the amount of $15,000,000.

**4.** It should be noted that the district court, in its certification order to this Court, stated: "The case cannot be completely resolved without determining whether BTI's self-insurance is available to Jackson irrespective of the issue of vicarious liability." Moreover, in a footnote in the order the district court observed: "The procedural posture of the case has rendered moot the factual question whether BTI is vicariously liable to Jackson for Donahue's driving."

However, the phrase in the first certified question "irrespective of vicarious liability" has

2. Where there is up to $500,000, in self-insurance available, is the extent of the company's coverage obligation limited to the dollar amounts provided for in *W.Va. Code*, 17D–4–2 [1979]?

## II

As indicated above, in order for a business such as BTI to gain approval for and attain self-insured status, it must meet certain federal and state qualifications. For a full understanding of the circumstances giving rise to the certified questions, it is important for us to explain the procedure that BTI completed to obtain self-insured status.

Pursuant to a decision rendered by the ICC in December, 1990, BTI was authorized to self-insure a portion of its bodily injury and property damage liability, with excess coverage to be provided by the Insurance Company of North America. 49 U.S.C. § 10927 (1988); 49 C.F.R. § 1043.5 (1994). Relevant portions of the ICC decision are as follows:

[BTI] is required to maintain security for the protection of the public in the amount of $1,000,000 per occurrence for [bodily injury and property damage.] [BTI] states that its annual savings from self-insurance will be approximately $100,000 to $200,000.

. . . .

Self-insurance of bodily injury and property damage liability appears fully warranted in this case.

. . . .

We believe . . . that [BTI] has adequate resources to self-insure its bodily injury and property damage liability[.]

On March 4, 1991, BTI requested permission from the West Virginia Public Service Commission to self-insure in West Virginia. In support of its request, BTI submitted the ICC authorization documents rendering BTI a qualified self-insurer. BTI stated in its subsequent formal application that it sought self-insurance authorization because self-insurance status would provide it with "[f]lexibility in the insurance market and enable it to avoid high premium cost and the uncertainty of coverage availability during hard market periods."

In its September 12, 1991, memorandum recommending that BTI be permitted to self-insure in West Virginia, the Public Service Commission compared the rules and regulations of the ICC, the PSC and the West Virginia Department of Motor Vehicles (hereinafter "DMV"). Many of the relevant PSC and DMV rules are set forth in the *West Virginia Code*. With regard to the PSC, *W.Va.Code*, 24A–5–5(g) [1961], specifies that the PSC shall:

Require common carriers by motor vehicle and contract carriers by motor vehicle subject to the provisions of this chapter either to procure insurance from a company authorized to write such insurance in West Virginia, or to qualify as a self-insurer, or to deposit such security, upon such terms and conditions and for such limits of liability as the commission shall determine to be necessary *for the reasonable protection of the traveling, shipping, and general public* against injury, loss, damage or default for which such carrier may be liable, and prescribe rules and regulations governing the filing of evidence of such insurance and such security with the commission. In fixing the amount of such insurance policy or policies, the qualifications as a self-insurer, or the deposit of security, the commission shall give due consideration to

---

placed this Court in an awkward position in view of the dismissal of Donahue. The actions of Donahue, no longer subject to adjudication at this point in federal court, serve as a connection between the obligations of BTI and the plaintiff under this State's omnibus clause statutes and case law. The parties have not addressed the effect of Donahue's dismissal from this action and, in that context, we would have preferred the first certified question to have been more carefully phrased.

In addition, it is important to note that, in the first certified question, this Court has been asked to address the obligations of BTI "under West Virginia law." The parties have not addressed the question of whether federal law precludes our discussion in this area, under the circumstances of this case. Bright lines of distinction do not appear in this complex area of regulatory law. The precedential value of this opinion is, therefore, somewhat limited, although this case does present an opportunity to consider the nature of self-insurance.

the character and amount of traffic, the value of the property transported, the number of persons affected, and the degree of danger involved in any such motor carrier operation.

(emphasis added).

Moreover, chapter 17D of the *West Virginia Code* is entitled "Motor Vehicle Safety Responsibility Law," and *W.Va.Code*, 17D–2A–3 [1988], requires security for motor vehicles licensed in West Virginia:

> Every owner or registrant of a motor vehicle required to be registered and licensed in this state shall maintain security as hereinafter provided[.]
>
> ....
>
> Such security shall be provided by one of the following methods:
>
> (b) By any other method approved by the commissioner of the department of motor vehicles of this state as affording security equivalent to that offered by a policy of insurance, including qualification as a self-insurer under the provisions of [*W.Va.Code*, 17D–6–2].

In addition, *W.Va.Code*, 17D–6–2(a) [1951] states: "Any person in whose name more than twenty-five vehicles are registered may qualify as a self-insurer by obtaining a certificate of self-insurance[.]" *W.Va.Code*, 17D–6–2(b) [1951], provides that a certificate of self-insurance may be acquired when the applicant "is possessed and will continue to be possessed of ability to pay judgments obtained against such person."

The Public Service Commission, in its September 12, 1991, memorandum acknowledged that it has additional criteria to which a self-insurer must adhere to attain such status. Moreover, minimum insurance requirements for trucking companies such as BTI were:

> Limit for bodily injuries to or death of one person—$50,000,00[.]
>
> Limit for bodily injuries to or death of all persons injured or killed in any one accident (subject to a maximum of $50,-000.00 for bodily injuries to or death of one person)—$100,000.00[.]
>
> Limit for loss or damage in any one accident to property of others (excluding cargo)—$25,000.00.

In its memorandum, the Public Service Commission noted, however, that pursuant to ICC regulations BTI had a substantially greater minimum security requirement. Moreover, in its application to self-insure in West Virginia, BTI indicated that it had qualified to self-insure in several other states.

In November, 1991, the Public Service Commission granted the request of BTI to self-insure in West Virginia. That decision was based upon the fact that BTI had met both the State standards for self-insurance and the standards set forth by the ICC.

### III

The plaintiff, who sustained injuries while riding in a freight truck owned by BTI, seeks the self-insurance proceeds of BTI as part of her recovery in this action. It is appropriate, therefore, for this Court to consider the nature of self-insurance.

■ The phrase "self-insurance" means, generally, the assumption of one's own risk and, typically, involves the setting aside of a special fund to meet losses and pay valid claims, instead of insuring against such losses and claims through an insurance policy. *Black's Law Dictionary* 1360 (6th ed. 1990); 38A *Words and Phrases*, "self insurer" (West Pub.1994). As stated in *Southern Home Insurance v. Burdette's Leasing Service*, 268 S.C. 472, 234 S.E.2d 870, 872 (1977): "In actuality, a self-insurer provides a substitute for an insurance policy." More specifically, the Supreme Court of Wisconsin, in *Hillegass v. Landwehr*, 176 Wis.2d 76, 499 N.W.2d 652 (1993), explained:

> Whereas contractual insurance policies involve a third-party insurer under-writing the insured's risk in exchange for premium payments, self-insurers retain their own risk in exchange for not paying premiums. The parties implicated in the risk-shifting may change depending on the particular arrangement, but the essence of the transaction remains the same: exchanging future liability for premium payments. In the words of the circuit court: 'self insurance is just a form of insurance ... the

modifying term "self" just indicates where it emanates[.]'

....

[T]he fact that the legislature permits companies to formulate the most efficient insurance coverage should not be misconstrued as a device to avoid liability by the self-retention of risk.

499 N.W.2d at 655–56.

In the course of defining "self-insurance," it is noted in *Black's Law Dictionary* that a common practice of business "is to self-insure up to a certain amount, and then to cover any excess with insurance. Workers' compensation obligations may also be met through this method if statutory requirements are met."

Indeed, this Court's experience with self insurance has been principally by way of our State Workers' Compensation system. *W.Va.Code,* 23–2–9 [1991]. As we stated in syllabus point 4 of *UMWA v. Lewis,* 172 W.Va. 560, 309 S.E.2d 58 (1983): "W.Va.Code 23–2–9 [1976] vests in the Commissioner the determination of an employer's initial eligibility to self-insure under the Workers' Compensation Laws; but the Commissioner has a ministerial responsibility to terminate that privilege when claimants show the self-insurer is not meeting obligations to claimants."

In this action, BTI, under federal and state law, was given the option of selecting the manner in which it would be financially accountable to others for injuries arising from its trucking operations. Self-insurer status, as to West Virginia, was granted by the West Virginia Public Service Commission. *W.Va. Code,* 24A–5–5(g) [1961]. BTI was, thus, "able to exercise its business discretion in devising a scheme of risk management that it considered most advantageous," and a different company "might have reached a contrary conclusion and contracted for coverage with a third-party insurer." *Hillegass, supra,* 499 N.W.2d at 655. The self-insurer option enabled BTI to save substantial sums of money which would have otherwise been paid to an insurance company in premiums.[5] Nevertheless, imparting to BTI permission to choose

the type of coverage best suited to its needs does not necessitate allowing BTI to avoid the obligations imposed upon those who operate a trucking business. As stated in *Hillegass, supra:* "[P]ermitting individuals to self-retain risk was not intended by the legislature to be a device by which self-insurers could escape the liabilities that would attach to third-party insurers." 499 N.W.2d at 656.

The liabilities of third-party insurers were discussed by this Court in *Universal Underwriters Insurance v. Taylor,* 185 W.Va. 606, 408 S.E.2d 358 (1991). *Universal Underwriters* concerned this State's statutory motor vehicle omnibus clause statutes, *W.Va. Code,* 33–6–31(a) [1982], and *W.Va.Code,* 17D–4–12(b)(2) [1991]. As stated in *W.Va. Code,* 33–6–31(a) [1982]:

No policy or contract of bodily injury liability insurance, or of property damage liability insurance, covering liability arising from the ownership, maintenance or use of any motor vehicle, shall be issued or delivered in this State ... unless it shall contain a provision insuring the named insured and any other person ... responsible for the use of or using the motor vehicle with the consent, expressed or implied, of the named insured or his spouse against liability for death or bodily injury sustained, or loss or damage occasioned within the coverage of the policy or contract as a result of negligence in the operation or use of such vehicle by the named insured or by such person[.]

Similarly, *W.Va.Code,* 17D–4–12(b)(2) [1991], provides that a motor vehicle liability policy shall insure the person named therein "and any other person, as insured, using any such vehicle or vehicles with the express or implied permission of such named insured, against loss from the liability imposed by law for damages arising out of the ownership, operation, maintenance or use of such vehicle or vehicles[.]"

*Universal Underwriters* involved an individual who obtained permission to remove a

---

**5.** BTI stated in its self-insurance application to the Public Service Commission that, if it were permitted to self-insure in West Virginia, BTI could "avoid high premium costs." The ICC noted this in its decision granting BTI permission to self-insure. As submitted by the plaintiff, BTI's annual premium savings would be approximately $109,682.

vehicle from a dealership and failed to return the vehicle. While driving the dealership's vehicle, the individual became involved in an accident resulting in a fatality. We held, in *Universal Underwriters,* that the dealership's insurer was required, under the above omnibus clause statutes, to provide coverage with regard to the accident. In so holding, we stated:

> Based on our recognition that a 'liability insurance contract is for the benefit of the public as well as for the benefit of the named or additional insured ...,' we hereby determine that the state motor vehicle omnibus clause requires an insurer to provide coverage when permission has been granted by the insured owner of the vehicle or its authorized agent to a driver who then causes injury or property damage during the permissive use. *Given the remedial nature of the omnibus clause, insurance coverage is not affected by the fact that the driver's use of the vehicle may have exceeded or differed from the owner's or his agent's specifications.*

185 W.Va. at 612, 408 S.E.2d at 364 (emphasis added).

In *Southern Home Insurance v. Burdette's Leasing Service, supra,* Burdette, in the business of renting motor vehicles to the public, qualified as a self-insurer under a South Carolina statute not unlike the West Virginia self-insurer provisions cited above. One of the rented vehicles was involved in an accident resulting in personal injury and property damage to a third party.

The issue before the Supreme Court of South Carolina, in *Burdette's Leasing Service,* was described as follows: "Does a self-insurer, qualified under our statute, provide the same coverage to automobiles owned by it as that which is required of an automobile liability insurance policy by our Motor Vehicle Financial Responsibility Law?" 234 S.E.2d at 872. In answering that question in the affirmative, the South Carolina court observed:

> We think it was the intention of the Legislature that a self-insurer provide the same protection to the public that a statutory liability policy provides. A self-insurer substitutes for an insurance policy to the extent of the statutory policy requirements. Therefore, we hold that Burdette's does self-insure the operation of its motor vehicles by persons using with consent, express or implied.

> By way of analogy, we note that the duties and liabilities of a self-insurer under Workmen's Compensation Law requires the self-insurer to pay those claims which normally would be paid by a Workmen's Compensation insurance carrier; thus, in like fashion, when one becomes a self-insurer under the Motor Vehicle Financial Responsibility Act, he must pay those claims which normally would arise under the terms of the Act and which are covered by the insurance policies described in the Act itself. This is consistent with the overall purpose of the Act.

234 S.E.2d at 872.

The court noted, in *Burdette's Leasing Service,* that the purpose of the statutory scheme in question was "to assure protection for the public for injuries and damages growing out of the negligent operation of motor vehicles on the roads of this State." 234 S.E.2d at 872.

In this action, it is clear that the above federal and state statutory and regulatory schemes concerning self-insurance, as well as the administrative decisions specific to BTI's self-insurance, have for their purpose the protection of the public. *W.Va.Code,* 24A–5–5(g) [1961]. Moreover, if BTI were permitted to avoid responsibility in the circumstances of this action, simply because it made a business decision to self-insure, the purpose of this State's omnibus clause provisions would be undermined. Such a subjugation of the protections discussed in *Universal Underwriters* is not contemplated under the West Virginia motor vehicle omnibus clause statutes. *W.Va.Code,* 33–6–31(a) [1982]; *W.Va.Code,* 17D–4–12(b)(2) [1991].

█ Accordingly, we answer the first certified question in the affirmative and hold that, under the law of this State, a foreign commercial trucking corporation, which has been granted authority by the West Virginia Public Service Commission to self-insure under *W.Va.Code,* 24A–5–5(g) [1961], must af-

ford, as a self-insurer, the same coverage under the West Virginia motor vehicle omnibus clause statutes, *W.Va.Code*, 33–6–31(a) [1982], and *W.Va.Code*, 17D–4–12(b)(2) [1991], for the protection of the public, as would a liability insurance contract. *See* n. 4, *supra*. In that regard, we find persuasive the statement in the plaintiff's brief to the effect that the option of BTI to self-insure "is a privilege, and it is unimaginable the legislature intended those to whom [West Virginia] grants this privilege would then be able to use it as a shield against liability to the public under circumstances where liability insurance would be required to pay." [6]

■ The second certified question states as follows: "Where there is up to $500,000, in self-insurance available, is the extent of the company's coverage obligation limited to the dollar amounts provided for in *W.Va.Code*, 17D–4–2 [1979]?" The settlement agreement quoted above recognizes that BTI is self-insured in the amount of $500,000. Moreover, a corporate officer of BTI informed the West Virginia Public Service Commission that "[t]he Company will self-insure its bodily injury and property damage liability to a level of $500,000."

*W.Va.Code*, 17D–4–2 [1979] provides:

The term 'proof of financial responsibility' as used in this chapter shall mean: Proof of ability to respond in damages for liability, on account of accident occurring subsequent to the effective date of said proof, arising out of the ownership, operation, maintenance or use of a motor vehicle, trailer or semi-trailer in the amount of twenty thousand dollars because of bodily injury to or death of one person in any one accident, and, subject to said limit for one person, in the amount of forty thousand dollars because of bodily injury to or death of two or more persons in any one accident, and in the amount of ten thousand dollars because of injury to or destruction of property of others in any one accident.

Even within the limits of state law, however, there is a divergence in this area. The minimum insurance requirements of the West Virginia Public Service Commission for trucking companies such as BTI were:

Limit for bodily injuries to or death of one person—$50,000,00[.]

Limit for bodily injuries to or death of all persons injured or killed in any one accident (subject to a maximum of $50,000.00 for bodily injuries to or death of one person)—$100,000.00[.]

Limit for loss or damage in any one accident to property of others (excluding cargo)—$25,000.00.

Those amounts are set forth in the September 12, 1991, memorandum of the Public Service Commission, and in that memorandum the Public Service Commission states that a proposal under consideration would increase the bodily injury liability and property damage liability insurance minimum limits even further. *See* 150 CSR 14, Rule IIA.

Nevertheless, in granting self-insurer status to BTI, the Public Service Commission weighed substantially BTI's compliance with federal law. The September 12, 1991, PSC memorandum concludes:

[B]ased on the fact that the applicant has met the ICC minimum requirements and our minimum requirements, Staff recommends that the applicant's request [to self-insure] be approved. Staff also recommends that the applicant be required to provide the Commission's Motor Carrier Section with any and all supplementary information that it provides to the ICC on the same time basis.

The November, 1991, order of the West Virginia Public Service Commission granting the request of BTI to self-insure in West Virginia was based, in part, upon the fact that BTI had met both the standards of the Public Service Commission and the federal requirements.

The federal requirements referred to are, of course, the minimum limits of liability coverage for trucking companies operating in interstate commerce, regardless of whether the company is self-insured. As recognized by the West Virginia Public Service Commission, the federal minimum limit of liability coverage for BTI was $750,000. 49 C.F.R. § 1043.1 (1994), *et seq.*; 49 C.F.R. § 387.9 (1994).

**6.** As stated above, the issue of the plaintiff's status as an unauthorized passenger and the resulting question of vicarious liability of BTI are not before this Court.

Obviously, BTI was operating in interstate commerce during the period in question and could not have done so without complying with the federal requirements. It was self-insured in other states, in addition to West Virginia. Accordingly, we hold that a foreign commercial trucking corporation operating in interstate commerce pursuant to a federal regulatory scheme, which provides federal minimum limits of liability coverage, is not subject to the limits set forth in W.Va.Code, 17D–4–2 [1979], concerning this State's financial responsibility provisions, even though the corporation was granted authority to self-insure by the West Virginia Public Service Commission. Therefore, we answer the second certified question in the negative.

The certified questions having been answered, this case is dismissed from the docket of this Court and remanded to the United States District Court for the Northern District of West Virginia.

Certified questions answered.

BROTHERTON, J., did not participate.

Miller, Retired J., sitting by temporary assignment.